UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CRESCENT BEACH CLUB LLC,
333 BAYVILLE AVE. RESTAURANT CORP.,
and JAMES SCOROPOSKI,

                              Plaintiffs,

            -against-

INDIAN HARBOR INSURANCE COMPANY,

                              Defendant.
--------------------------------------------------------X
FEUERSTEIN, District Judge:

**FILED**
**CLERK**

6/22/2020 12:32 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**ORDER**
18-CV-5951(SJF)(AKT)

I.      Introduction

       On or about September 27, 2018, plaintiffs Crescent Beach Club LLC ("CBC"), 333

Bayville Ave. Restaurant Corp. ("333 Bayville") and James Scoroposki ("Scoroposki")

(collectively, "plaintiffs") commenced this action in the Supreme Court of the State of New

York, County of Nassau (the "state court"), against defendant Indian Harbor Insurance Company

("Indian Harbor" or "defendant") seeking, *inter alia*, judgment declaring that defendant is

required to defend and indemnify them with respect to two (2) actions commenced by Robert

Flores ("Flores") in the state court. On October 24, 2018, defendant filed: (A) a notice of

removal pursuant to 28 U.S.C. §§ 1441 and 1446, removing the action to this Court based upon

this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a); and (B) an answer

and counterclaims against plaintiffs and Ocean Restaurant (collectively, the "Crescent Beach

parties"), seeking, *inter alia*, judgment declaring that defendant is not legally obligated to defend

or indemnify the Crescent Beach parties in the underlying actions, and that CBC, 333 Bayville

and Ocean Restaurant (collectively, "Crescent Beach") must reimburse defendant for past

1

defense costs it incurred in one of the underlying actions. Pending before the Court are the parties' respective cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the cross motions are granted in part and denied in part.

## II.    Background

### A.    Factual Allegations[1].

Indian Harbor issued a commercial general liability insurance policy bearing Policy No. ESG300084401, effective June 17, 2016 through June 17, 2017 (the "Policy"), to 333 Bayville, providing limits of one million dollars ($1,000,000.00) per occurrence, subject to a ten thousand dollar ($10,000.00) per occurrence deductible. (56.1, ¶¶ 1, 3)[2]. Pursuant to Endorsement No. 1,

---

[1] The factual allegations are taken from the materials in the record that would be admissible in evidence, *see*, Fed. R. Civ. P. 56(c)(1), and the parties' statements and counterstatements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"), to the extent that they are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.") Moreover, only those facts that are material to the disposition of the motions, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505)). The facts are undisputed unless otherwise indicated.

[2] Where the facts are undisputed, defendant's Statement of Material Facts pursuant to Local Civil Rule 56.1 and the counterstatements of the Crescent Beach parties and defendant are collectively cited as "56.1 Stat." Where the facts are disputed and properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, defendant's 56.1 Statement is cited as "Def. 56.1", the Crescent Beach parties' counterstatement thereto is cited as "CBP 56.1", and defendant's counterstatement is cited as "Def. Counter."

the Policy lists CBC and "Ocean" as named insureds, (*id.*, ¶ 2), but the parties dispute whether

Scoroposki is also an insured under the Policy. (*See* CBP 56.1, ¶ 2).

The Policy also contains an endorsement providing an exclusion of coverage for

"Designated Ongoing Operations" (the "Construction Exclusion"), (56.1, ¶ 4), which states:

> "This policy does not apply to any 'bodily injury', 'property damage', 'personal and advertising injury', or any other loss, cost, defense fee, expense, injury, damage, claim, dispute or 'suit' either arising out of, or related to, any construction, renovation, rehabilitation, demolition, erection, excavation or remedition [*sic*] of any building and includes planning, site preparation, surveying or other other [*sic*] construction or development of real property. This exclusion, however, shall not apply to routine maintenance activities."

(*Id.*, ¶ 5).

On or about February 2, 2017, Flores commenced an action in the state court against

Crescent Beach (the "Crescent Action"), alleging, *inter alia*, that on or about January 24, 2017[3],

he "was a worker lawfully at the premises located at 333 Bayville Avenue, Bayville, NY 11709"

(the "Premises"). (56.1 ¶¶ 7-9). The complaint in the Crescent Action alleges, *inter alia*, that

Crescent Beach: (i) owned the Premises; (ii) was "the general contractor at the premises

regarding the work, labor and service performed thereat;" (iii) "entered into an agreement to

have certain work, labor and services performed at the premises;" (iv) "obtained permit(s) to

perform certain work at the premises;" (v) "directed … controlled … [and] managed the work

performed at the premises and the work and/or the apparatus provided and utilized in connection

with the work performed at the premises;" and (vi) violated Sections 200, 240(1) and 241(6) of

---

[3] The Crescent Action complaint alleges that the underlying accident occurred "on January 24, 2017," but it is undisputed that the alleged accident occurred on January 25, 2017. (*See* Def. 56.1, Ex. E at 13-14).

the Labor Law of the State of New York.[4] (56.1, ¶¶ 10-14, 19-21). In addition, the Crescent

Action complaint alleges, *inter alia*, (i) that Flores "was lawfully at the premises as an employee

of Phil-Mar, Inc. ['Phil-Mar'], hired to perform work, labor and/or services at the premises;" (ii)

that "on January 24, 2017 [*sic*], while … lawfully engaged in his employment in the work,

demolition, construction, alteration and/or renovation of the aforesaid premises, [Flores] was

caused to fall from a height off a wooden structure located on the premises, thereby sustaining

severe and permanent personal injuries;" (iii) that "there existed at the aforementioned premises,

a dangerous, hazardous, unguarded, unsupervised, unprotected and unsafe condition;" and (iv)

that Flores's injuries were "caused by reason of the negligence, carelessness and recklessness of

[Crescent Beach], their agents, servants and/or employees, in their ownership, operation,

management, maintenance, control, supervision, inspection and repair of the premises." (*Id.*, ¶¶

15-18).

On or about February 16, 2017, Indian Harbor received first notice of the Crescent

Action. (56.1, ¶ 23; Counterclaims ["Countercl."], ¶ 29; CBP 56.1, ¶ 33). During his deposition

on January 3, 2019, Richard Simanoff ("Simanoff") testified, in relevant part: (i) that he was the

wholesale insurance broker who placed the Policy for plaintiffs; (ii) that in a February 21, 2017

e-mail to Michael Barnaba ("Barnaba"), defendant's claim handler, he wrote, "This claim has

nothing to do with a construction project. It was with respect to routine maintenance work which

should have been included as an exception in the form;" (iii) that in a February 23, 2017 e-mail

sent by Matthew Silver ("Silver"), the manager of the Premises, to Barnaba, which was copied to

---

[4] The Crescent Beach parties admit that Flores made the allegations in the Crescent Action complaint, but deny the
truthfulness of those allegations. (CBP 56.1, ¶¶ 10-22, 28).

Simanoff, Silver wrote, "This was a small maintenance job at the entrance pergola by Bayville Avenue;" and (iv) that in a March 3, 2017 e-mail, Simanoff wrote, "This situation is similar to hiring a landscaper at your house and then calling him back to fix or remove something." (56.1, ¶¶ 75-83).

During his deposition on February 11, 2019, Barnaba testified, in relevant part, (i) that he is the adjuster assigned to handle the claim giving rise to this action; and (ii) that "[t]he first report from the broker was that he [Flores] was pulling vines off of the pergola." (56.1, ¶¶ 84-86). A March 11, 2017 claims note by Barnaba indicates, *inter alia*,

> "I recall the broker told me on the phone upon receipt of my initial email that the plaintiff [Flores] was *pulling vines down off the pergola* when he fell, but in the email chain he indicates 'The claimant was taking down the pergola and got hurt[.[5]]' The insured has not been responsive to my emails seeking more specific project details. I note our construction exclusion is broad but not clearly defined. I don't know if 'taking down' the pergola would be construed to fall within the scope of 'demolition' (undefined) which is excluded. I also do not know what entails 'routine maintenance activities' (again undefined) as opposed to the various excluded construction activities. First and foremost we need a clear picture of the project which we presently lack. I am unable to determine coverage at this time. Therefore I think best course of action is to issue ROR, further investigate the scope of work (pull permits, depose plaintiff, plaintiff employer, insureds), and then review with Claims Legal if our Exclusion applies or not. . . ."

(Aboulafia Decl., Ex. 13) (emphasis added).

Indian Harbor issued a reservation of rights letter dated March 13, 2017 (the "ROR"), (56.1, ¶ 24), pursuant to which it agreed to defend Crescent Beach in the Crescent Action under the Policy, subject to a reservation of rights, and quoted the Construction Exclusion, stating:

---

[5] The email to which Barnaba refers is dated March 6, 2017. (Declaration of Matthew S. Aboulafia in Support of the Crescent Beach Parties' Motion for Summary Judgment ["Aboulafia Decl."], Ex. 13).

"We note Plaintiff [Flores] alleges he was injured while engaged in 'demolition, construction, alteration and/or renovation of the aforesaid premises.' Your policy specifically excludes any coverage for claims arising from Construction, Demolition, Renovation and Rehabilitation; however this Exclusion does not apply to routine maintenance activities.

At this time, we have insufficient information on the scope of work contracted and being performed by [Flores] to determine if the aforementioned Exclusion applies to bar coverage for this matter. Therefore, while we agree to undertake your defense at the outset of litigation, in accordance with any coverage which may be afforded by the policy, we must do so under a full reservation of rights. Once discovery has sufficiently progressed for us to make an informed decision on coverage, we will communicate with you further to advise you if we determine the Exclusion does apply and the policy affords no coverage for this claim. We expressly reserve the right to both deny coverage and withdraw your defense in this matter. We further reserve the right to file a declaratory judgment action and seek the court's determination on coverage should we find that to be necessary in this matter."

(*Id.*, ¶¶ 26-27). The ROR further provides, *inter alia*, that Indian Harbor retained Marc H. Pillinger, Esq., of Pillinger Miller Tarallo, LLP ("PMT"), to defend Crescent Beach in the Crescent Action. (Def. 56.1, Ex. C).

On July 27, 2017, Flores served a Verified Bill of Particulars in the Crescent Action, *inter alia*, (i) indicating that he sustained "permanent and personal injuries," including but not limited to "traumatic spinal cord injury," "paralysis/paraplegic from umbilicus downward," "loss of sensation bilateral lower extremities," "loss of motor control in the lower extremities," "inability to ambulate," and "inability to walk;" and (ii) claiming special damages, including medical damages, lost earnings, and loss of income, totaling in excess of one hundred twenty-seven thousand six hundred twenty six dollars and forty-five cents ($127,626.45) as of the date of the Verified Bill of Particulars.[6] (56.1, ¶¶ 29-32).

---

[6] The Crescent Beach parties admit that Flores made the allegations in the Verified Bill of Particulars in the Crescent Action, but deny knowledge and information to form a belief as to the truthfulness of those allegations. (CBP 56.1, ¶¶ 31-33).

In a claims note dated September 23, 2017, Barnaba indicates, *inter alia*, "Note photos of gazebo are provided and show a large structure with a fork lift [*sic*] being used in the work. I'll forward this to claims legal for further coverage analysis. This does not appear to be minor routine maintenance repair job from these photos." (Aboulafia Decl., Ex. 15).

On March 9, 2018, Flores was deposed in the Crescent Action, (56.1, ¶ 34), and testified, in relevant part, as follows:

    a.    On January 25, 2017, he was working for Phil-Mar, which he described as a company that "does a little of everything … in construction," at the Crescent Beach "worksite;"

    b.    His job was to "demolish a frame" at the "job site;"

    c.    As part of the demolition, Phil-Mar used a "lift machine;"

    d.    As he demolished the pergola, a "man lift" was used to support the structure's frame;

    e.    Immediately before he fell, he was on top of the pergola using a "Sawzall" to cut and remove "large" beams of wood, which measured approximately six (6) feet in length;

    f.    He fell from a height of approximately "13 to 14 feet;"

    g.    After the fall, he "tried to get up," but "was unable to move [his] legs;" and

    h.    As a result of the fall, his "spinal cord broke."

(Def. 56.1, Ex. E at 13, 17-18, 21, 28, 43-48, 52, 60, 62).

On May 21, 2018, Matthew Silver ("Silver") was deposed in the Crescent Action, (56.1, ¶ 38), and testified, in relevant part, as follows:

    a.    From 2013 through the date of the deposition, he was the general manager of Crescent Beach, which he described as a "catering hall and restaurant;"

        b.      In January 2017, a pergola at Crescent Beach "was being dismantled or taken down;"

        c.      The wood pergola was approximately "15 foot" wide, "40 feet" long, and approximately "14 or 15 feet" high; and

        d.      Phil-Mar was hired "to take down the pergola."

(Def. 56.1, Ex. F at 6, 9, 11-13). Silver further testified, in pertinent part: (i) that he discussed with Leland Denny ("Denny") "that the structure was becoming dangerous" because "part of the wood was rotted . . . in the top structure," and they "needed to remove it before the winter and too much snow came down," (*id.* at 14); (ii) that he "just noticed" that the wood "was not looking good" because it was noticeable as you drove through the pergola and "look[ed] up," (*id.* at 15); (iii) that Denny had asked Phil-Mar to take down the pergola, (*id.* at 12-13); and (iv) that half of the pergola "was taken down and then rebuilt" because it was rotted. (*Id.* at 30-31).

However, in a subsequent affidavit, dated April 15, 2019, *i.e.* approximately one (1) year later, which the Crescent Beach parties submitted in support of their motion for summary judgment dismissing Flores's New York Labor Law claims in the state court, Silver asserted, *inter alia*, (i) that Phil-Mar was retained by him "solely to remove the rotted and worn wood on the top right portion of the pergola when viewed from the street," (Aboulafia Decl., Ex. 5, ¶ 2); (ii) that the pergola "was routinely inspected on an annual basis, along with all the other wooden structures at the subject premises, . . . [and the] wood had degraded to a point where the rot was becoming visible, and was presenting a potential safety risk," (*id.*, ¶ 3); (iii) that "the pergola is a decorative structure at the front entrance of the premises," (*id.*); (iv) that "the pergola was re-stained approximately every two years since its construction," but no other repairs had been

undertaken previously, (*id.*, ¶ 4); and (v) that he took photographs and video of the pergola on March 25, 2019, *i.e.*, more than two (2) years after the date of the underlying accident. (*Id.*, ¶ 5).

The Crescent Beach parties also submitted an affidavit and report of their purported expert, Michael Aiello ("Aiello"), in support of their motion for summary judgment in the state court, in which Aiello asserts, *inter alia*, that, based upon his experience, inspection of the pergola on March 24, 2019, *i.e.*, approximately two (2) years after the incident, conversations with Silver and review of the photographs taken by Silver on March 25, 2019: (i) "[a]ll that was done to the pergola was that the old, worn and rotted wood on only the top right side was replaced with new wood of the exact same dimensions and specifications;" (ii) the work "was performed to approximately 25% of the structure in its entirety;" (iii) "no alterations were made to the structure;" (iv) "[o]nly wood in need of replacement was in-fact [*sic*] replaced[,] . . . and only with wood identical in type and dimension;" (v) "the work performed was cosmetic in nature only;" (vi) "when factoring the type of structure, its decorative nature, and the materials it is comprised of, such a structure would not require maintenance for approximately 25-30 years after its construction;" and (vii) "[t]he new wood will likely need replacement/maintenance again in another 25-30 years."[7] (Aboulafia Decl., Ex. 6). Notwithstanding his assertion "that maintenance was performed to approximately 25% of the structure in its entirety," (*id.*), Aiello also indicates in his report, *inter alia*, that four (4) of the six (6) support posts and sixteen (16) of

---

[7] It is unnecessary to consider the issue of the admissibility of Aiello's opinions based upon the Crescent Beach parties' purported failure to properly serve the expert disclosure required by Rule 26(a)(2) of the Federal Rules of Civil Procedure since, *inter alia*, those opinions which are within the permissible scope of the Federal Rules of Evidence do not affect the outcome of the instant motions. Indeed, as set forth below, Aiello's permissible opinions support the conclusion that the work in which Flores was engaged at the Premises falls within the scope of the Construction Exclusion and does not constitute "routine maintenance activities" within the meaning of the exception to the Construction Exclusion.

the twenty-four (24) support beams of the pergola, or approximately two-thirds (2/3) of the

support posts and beams which are attached to concrete piers by galvanized angle brackets, were

replaced. (*Id.*). Aiello also asserts that half of the beams which comprise the wooden trellis that

sits atop those support posts and beams, *i.e.*, fourteen (14) of the twenty-eight (28) beams that

comprise the top level of the trellis; nine (9) of the eighteen (18) beams that comprise the middle

level of the trellis; and eight (8) of the sixteen (16) beams that comprise the lower level of the

trellis, were replaced. (*Id.*). According to Aiello, "no maintenance or work was performed to the

footings below grade, the concrete piers, or any of the connecting hardware" of the structure.

(*Id.*).

On June 18, 2018, Philip Marrone ("Marrone") was deposed in the Crescent Action,

(56.1, ¶ 42), and testified, in relevant part, as follows:

   a.   He is the founder and president of Phil-Mar;

   b.   In or around mid-January 2017, Phil-Mar was hired "to rebuild the entrance
        coming into the parking lot there, the wood structure;"

   c.   Denny, who he described as the "handyman" for Crescent Beach, contacted
        Marrone to do the project at the Premises because the "job was too big for
        him;"

   d.   On January 25, 2017, Phil-Mar began the project "to dismantle an existing
        pergola and replace it with a new pergola," staffed a supervisor and three
        (3) laborers on the project, and supplied "the man lift and a forklift," as well
        as two ladders, hammers, a saw and other tools for "the project;" and

   e.   It was estimated that Phil-Mar would require "three or four weeks" of
        laborers working five days week to demolish the pergola "and then to erect
        a new one."

(Def. 561., Ex. G at 6, 15, 17, 20-26, 31, 62). In addition, Marrone testified that Flores's brother,

Alex Flores ("Alex"), was also assigned to work at the Premises on the date of the accident.[8] (*Id.*

at 28).

On August 6, 2018, Denny was deposed in the Crescent Action, (56.1, ¶ 46), and

testified, in relevant part, as follows:

     a.    Prior to January 2017, he performed work at the Premises, including "light carpentry, cabinet building," "fix[ing] some chairs, fix[ing] some molding," "buil[ding] a deck," and "repair[ing] a wall;"

     b.    In or around December 2016, Scoroposki and Silver contacted him to discuss repairing the pergola;

     c.    In December 2016 or early January 2017, he inspected the pergola and determined that the project "was too much for [him] to do" "[b]ecause [of] the big pieces of wood," and noted that he could not handle a job on the "big pergola;"

     d.    He recommended that Phil-Mar be hired to perform the work; and

     e.    As part of the project, Phil-Mar used "saws" and a "lift thing."

(Def. 56.1, Ex. H at 10-11, 13-14, 16-17, 22, 28, 36, 53).

Scoroposki was also deposed in the Crescent Action on August 6, 2018, (56.1, ¶ 50), and

testified, in relevant part, as follows:

     a.    He owns the Crescent Beach Club;

     b.    Before January 2017, Denny did work as a "handyman" for him at the Premises, including "light construction work;" and

     c.    Phil-Mar was a "general contractor" hired to "work[] on the pergola" because Denny said it was "too big of a job" for him.

---

[8] Flores testified that Alex helped him to cut and remove pieces of wood and operated the lift machine at the Premises, (Def. Ex. E at 33-34, 37, 39, 41, 43, 53-54, 56, 58, 78-79); and that Alex "said he doesn't recall much [about how the incident happened] because he was driving or using the machine. . . ." (*Id.* at 56).

11

(56.1, ¶ 52(a); Def. 56.1, Ex. I at 10-12, 18-20, 26-27).

On or about August 30, 2018, Flores commenced an action in the state court against Scoroposki (the "Scoroposki Action")[9], among others, alleging, *inter alia*, (i) that on January 25, 2017, he "was a worker lawfully at the premises located at 333 Bayville Avenue, Bayville, NY 11709;" and (ii) that Scoroposki (A) "was the general contractor at the premises regarding the work, labor and services performed thereat," (B) "operated," "managed," "maintained," "supervised," and "inspected the premises and the work, labor and services performed thereat," (C) "entered into an agreement to have certain work, labor and services performed at the premises," (D) "obtained permit(s) to perform certain work at the premises," and (E) "directed … controlled … [and] managed the work performed at the premises and the work and/or the apparatus provided and utilized in connection with the work performed at the premises."[10] (56.1, ¶¶ 58-65). In addition, the Scoroposki Action complaint, *inter alia*, (i) alleges: (A) that Flores "was lawfully at the premises as an employee of Phil-Mar, Inc., hired to perform work, labor and/or services at the premises," and (B) that "on January 25, 2017, while … lawfully engaged in his employment in the work, demolition, construction, alteration and/or renovation of the aforesaid premises, [Flores] was caused to fall from a height off a wooden structure located on the premises, thereby sustaining severe and permanent personal injuries;" and (ii) asserts the

---

[9] On or about March 18, 2019, the Scoroposki Action and the Crescent Action were consolidated in the state court. (56.1, ¶ 90). The consolidated action is hereinafter referred to as the "underlying action."

[10] The Crescent Beach parties admit that Flores made the allegations in the Scoroposki Action complaint, but deny the truthfulness of those allegations. (CBP 56.1, ¶¶ 60-69).

same claims against Scoroposki that Flores asserts against Crescent Beach in the Crescent Action. (*Id.*, ¶¶ 66-68).

By letter dated September 7, 2018 (the "September 7, 2018 Disclaimer"), *i.e.*, approximately one (1) month after Denny's and Scoroposki's depositions in the Crescent Action, Indian Harbor disclaimed coverage under the Policy with respect to the Crescent Action, (56.1, ¶ 54), indicating, in pertinent part:

> "As discussed further below, based upon the recent discovery in the Litigation [the Crescent Action] – including examinations before trial ('EBT') that concluded in August 2018 – Indian Harbor now has sufficient information to make an informed decision on coverage. The recently-elicited [*sic*] evidence in the Litigation demonstrates that Mr. Flores' bodily injury arises out of and/or relates to work that is excluded under the Construction Exclusion. Accordingly, Crescent is not entitled to coverage in the Litigation, and Indian Harbor therefore disclaims coverage."

(56.1, ¶ 56).

Approximately one (1) week later, *i.e.*, on or about September 14, 2018, Indian Harbor received first notice of the Scoroposki Action. (56.1, ¶ 70; Countercl., ¶ 67). By letter dated September 20, 2018 (the "September 20, 2018 Disclaimer"), Indian Harbor disclaimed coverage in the Scoroposki Action, stating, in pertinent part:

> "Even if Mr. Scoroposki . . . could satisfy their burden to show that they are insureds under the Policy, the Construction Exclusion bars coverage. The Complaint in the Litigation demonstrates that Mr. Flores' bodily injury arose from construction activities excluded under the policy, for example: (a) the Defendants' role as 'general *contractor*'; (b) the Defendants obtaining permits for the project; (c) Mr. Flores performing 'demolition, construction, alteration, and/or renovation … [of] a wooden structure'; (d) repeated references to the 'work site'; and (e) counts alleging violations of New York Labor Law that do not apply to routine maintenance. The discovery in the Related Litigation also confirms that Mr. Flores' bodily injury arose from construction activities excluded under the Policy."

(56.1, ¶¶ 71-73) (emphasis in original).

13

By order dated December 12, 2019, the state court, *inter alia*, denied the Crescent Beach parties' motion seeking summary judgment dismissing Flores's New York Labor Law claims on the grounds that Flores was engaged in "routine maintenance" at the time he sustained his alleged injuries, finding that Flores "submitted sufficient evidence to raise an issue of fact as to whether the work performed constituted 'repair' or 'routine maintenance' under Labor Law § 240(1)." *Flores v. Crescent Beach Club LLC*, No. 0669/2017 (N.Y. Sup. Ct., Nassau Cty. Dec. 12, 2019). The state court further found, in relevant part:

> "Leland Denny, who is known to be a handyman for the premises, testified at his deposition that he never performed any type of preventative maintenance on the wooden structure in question. The work in question was an isolated event, as opposed to a reoccurring condition. Phillip Marrone . . . testified that his company [Phil Mar] was hired to dismantle an existing pergola and replace it with a new pergola. Matt Silver, the manager of the premises, testified that the pergola had become rotted and that it needed to be taken down before the winter. Phillip Marrone further testified that he had instructed his men that they had to dismantle a pergola on the day in question. *Dismantling and replacing the structure supports the finding that the work in question was repair work rather than routine maintenance*. In light of this testimony and the record presented to this Court, *it is evident that the work performed by [Flores] on January 25, 2017 qualifies as repair work rather than routine maintenance*."

*Id.* (emphasis added). Thus, the state court found that the Crescent Beach parties "failed to establish a *prima facie* right to summary judgment" dismissing Flores's claims pursuant to New York Labor Law §§ 241(6) and 240(1).[11] *Id.* However, there is no indication in the record that Flores ever moved for summary judgment on his Labor Law claims in the underlying action; nor that the state court ever considered granting him summary judgment on those claims.

---

[11] In light of the state court's determination of the Crescent Beach parties' motion for summary judgment in the underlying action, the branch of their cross motion contending that they would "be unduly prejudiced in the underlying action if the[ instant] motions [for summary judgment] are decided," (CBP Mem. at 10-12), is moot.

B.    Procedural History

On or about September 27, 2018, plaintiffs commenced this action against defendant in the state court seeking, *inter alia*, judgment declaring that defendant is required to defend and indemnify them with respect to the underlying action. Specifically, plaintiffs assert two (2) causes of action contending, *inter alia*, that the basis for defendant's disclaimer of coverage in both the September 7, 2018 Disclaimer and the September 20, 2018 Disclaimer, *i.e.*, that the work being performed on the Premises falls within the scope of the Construction Exclusion, is improper. (Compl. ¶¶ 14-15). The complaint does not assert a claim challenging the timeliness of defendant's September 7, 2018 Disclaimer or alleging that defendant is estopped from disclaiming coverage based upon the timeliness of the September 7, 2018 Disclaimer.

On October 24, 2018, defendant filed a notice of removal pursuant to 28 U.S.C. §§ 1441 and 1446, removing the action to this Court based upon the Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), and an answer and counterclaims against the Crescent Beach parties, seeking, *inter alia*, judgment declaring: (i) that Flores's alleged injuries arose out of or relate to work excluded by the Construction Exclusion in the Policy; (ii) that defendant is not legally obligated to defend or indemnify the Crescent Beach parties in the underlying actions; and (iii) that Crescent Beach must reimburse defendant for past defense costs incurred in the Crescent Action, which it claims total fifty-three thousand six hundred eighty-six dollars and six cents ($53,686.06). (Def. 56.1, ¶ 87). The Crescent Beach parties filed an answer to the counterclaims on October 29, 2018, but did not assert therein that defendant is estopped from disclaiming coverage based upon the timeliness of the September 7, 2018 Disclaimer.

During an initial pretrial conference before this Court on November 26, 2018, *inter alia*, defendant was directed to produce its claims and underwriting files with respect to this matter. (56.1, ¶ 100). Defendant produced those records shortly thereafter,[12] but withheld and/or redacted forty-four (44) documents: twenty-two (22) on the basis of work product doctrine or attorney-client privilege, including certain communications involving Suzan Friedberg, Esq., Associate General Counsel in the Claims Legal Department at XL Specialty Insurance Company[13], which is the direct parent of Indian Harbor; and the remainder on the basis of relevancy. (56.1, ¶¶ 101-103; *see* Aboulafia Decl., Ex. 10). One of the documents redacted on the basis of attorney client privilege is a claims note, dated May 23, 2017, referencing "Coverage Analysis" and indicating: "Analysis by claims legal. They opine NY Labor Laws 241(6) or 240(1) do not apply to routine maintenance, so to the extent plaintiff [Flores] can prevail under those theories. . ." (Aboulafia Decl., Ex. 14). The rest of that claims note is redacted.

In addition, although defendant produced various updates and reports from PMT regarding the Crescent Action which were in its claim file, there were no updates or reports dated between October 2, 2017 and August 2, 2018.[14] (*See* Aboulafia Decl., Ex. 10 and 12). The

---

[12] Defendant's Privilege and Redaction Log bears the date "12/3/2018" in the upper left-hand corner. (Aboulafia Decl., Ex. 10).

[13] During his deposition, Barnaba testified that in "working [his] way through the policy interpretation," he consulted with both Yonathan Casilla ("Casilla"), the underwriter, and Ms. Friedberg in her capacity as staff coverage counsel. (Aboulafia Decl., Ex. 11 at 15-17). According to Barnaba, he "reached out to Claims Legal at the outset of the case," which he "believe[d] . . . was before [he] issued the reservation of rights letter and before [Indian Harbor] undertook Crescent's defense." (*Id.* at 17-18). In addition, Barnaba testified that he believed he reviewed a summary of Denny's testimony, to which the ROR refers, although he did not "directly recall that;" and that he did not "recall reading any EBT transcripts [of the other witnesses], but [he] would expect that [he] received and reviewed summaries of all the testimony from defense counsel." (*Id.* at 63).

[14] In their reply papers, the Crescent Beach parties submit, *inter alia*, "Previously Undisclosed Reports from [PMT] that were/are missing from Defendant's claim's [*sic*] file," ("Declaration of Matthew S. Aboulafia in Further Support of Plaintiff's Cross-Motion for Summary Judgment" ["Aboulafia Reply"], ¶ 2), for the period between October 24, 2017 and September 26, 2018. (*Id.*, Ex. 18). The March 30, 2018 report contains a summary of Flores's

Crescent Beach parties never timely objected to defendant's disclosures; nor did they ever move to compel further production, or otherwise bring the matter to the Court's attention prior to defendant moving for summary judgment.[15]

The parties now cross-move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and agree that the sole issue before this Court is whether Flores was engaged in work within the meaning of the Construction Exclusion in the Policy when the underlying incident allegedly occurred, or whether he was engaged in "routine maintenance activities" within the meaning of the exception to the Construction Exclusion.

III.    Discussion[16]

A.    Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to

---

[15] deposition; the May 30, 2018 report contains a summary of Silver's testimony; the June 19, 2018 report contains a summary of Marrone's deposition testimony; and the September 26, 2018 report summarizes a certification conference in the state court and indicates, *inter alia*, that discovery in the Crescent Action was complete, but that Flores subsequently commenced the Scoroposki Action. (*Id.*).

[15] The only discovery dispute brought to this Court's attention prior to the motion for summary judgment was with respect to the scope and subject matter of Barnaba's deposition. (*See* Docket Entry ["DE"] 15). Pursuant to Rule 5(D) of the undersigned's individual rules, by failing to timely bring a discovery dispute to the Court's attention, the parties waive such discovery. Moreover, in their letter motion regarding Barnaba's deposition, the Crescent Beach parties expressly represented that they "do[] not anticipate, nor [do they] intend on, deposing any other parties in this matter." (DE 15).

[16] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*,

18

557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the

non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

Where multiple parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also Coutard v. Municipal Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) ("The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief. . . . In considering such motions and determining whether there is a genuine issue of fact to be tried, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.")

### 1.     Fed. R. Civ. P. 56(d)

The Crescent Beach parties request, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, that the parties' respective cross motions for summary judgment be held "in abeyance pending the completion of discovery in the underlying action, as well as in the instant action." ("Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment" ["CBP Mem."] at 7).

Rule 56(d) of the Federal Rules of Civil Procedure provides, in relevant part, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it. . . ." "Rule 56(d) expressly requires the nonmoving party who seeks further discovery in these circumstances to make a 'show[ing] by affidavit or declaration' of the reasons for needing the relief." *Kazolias v. IBEWLU 363*, 806 F.3d 45, 54 (2d Cir. 2015). The affidavit or declaration must "show[] (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003); *accord Ortiz v. Case*, 782 F. App'x 65, 66 (2d Cir. Oct. 29, 2019) (summary order).

The Crescent Beach parties do not actually assert that they are unable to present facts essential to justify their opposition to defendant's motion, *i.e.*, regarding the nature of the work being performed by Flores at the time of the alleged accident, much less specify any reasons for why they are unable to do so. Nor have they filed an affidavit or declaration explaining their need for additional discovery; they merely assert in their memorandum of law in support of their cross motion and in opposition to defendant's motion that "there is still a significant amount of discovery to be conducted in the underlying action including the *further* deposition of all parties, as well as the non-party deposition of Alex Flores . . . [which] is necessary to get a clear picture of the work performed by Phil-Mar, and whether same arguably qualifies as 'routine maintenance.'"[17] (CBP Mem. at 7) (emphasis added).

---

[17] In support of their contention, the Crescent Beach parties refer only to paragraph 96 of their 56.1 Statement, which indicates: "In the event that any of the Crescent defendants remain in the underlying action after the

21

The Crescent Beach parties' failure to file the affidavit or declaration required by Rule 56(d) of the Federal Rules of Civil Procedure "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 464 (2d Cir. 2020); *see also Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) ("A reference to Rule 56(f) [now Rule 56(d)] and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit.")

In any event, "[a] party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials must show that the material

---

dispositive motions are decided, Crescent will demand the further deposition of all party witnesses, as well as the deposition of non-party Alex Flores (brother of Robert Flores and employee of Phil-Mar, Inc.) who is the key witness to the incident in question." (CBP 56.1, ¶ 96). In support of that assertion, the Crescent Beach parties cite only to the deposition testimony of Flores indicating that Alex is his brother, (*id.* [citing Def. 56.1, Ex. E at 19:7-19:8]); and to the testimony of Marrone indicating that Alex was also assigned to work at the Premises on the date of the accident and that Alex operated the man lift while Flores was supposed to do the cutting. (*Id.* [citing Def. 56.1, Ex. G at 25:22-25:25 and 28:10-28:15]). The Crescent Beach parties cite to no evidence to support their assertion that Alex "is the key witness to the incident in question" and, in fact, Flores's testimony is to the contrary. (*See* Def. 56.1, Ex. E at 56 [testifying that Alex "said he doesn't recall much [about how the incident happened] because he was driving or using the machine. . . ."]). Mere speculation about what further discovery might reveal is insufficient to warrant relief under Rule 56(d) of the Federal Rules of Civil Procedure. *See, e.g. Ortiz*, 782 F. App'x at 67. Moreover, Flores and Marrone testified consistently about the work Phil Mar was retained to perform at the Premises, and the Crescent Beach parties have submitted nothing indicating that Alex's testimony would be anything but cumulative, or would otherwise create a genuine issue of material fact with respect to the nature of the work being performed by Flores at the time of the alleged accident.

The Crescent Beach parties also fail to provide any reason for why the further deposition of any of the party witnesses is necessary, other than to state that the further depositions of Flores and Marrone are necessary in order to "get clarification on the apparent inconsistency between . . . [their deposition testimony in the Crescent Action] and the work actually performed as evidenced by the photographs of the pergola as it exists today." (CBP Mem. at 8). The Crescent Beach parties do not explain why such discovery was not readily ascertainable earlier or previously pursued, and, indeed, discovery in the Crescent Action was certified as complete in September 2018. In any event, such discovery would not change the outcome of defendant's summary judgment motion. *See, e.g. Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) (affirming denial of additional discovery where, *inter alia*, the plaintiffs "made no showing that they did not have reasonable access to such disclosures prior to bringing their Rule 56(f) request" and the disclosures were "easily discoverable prior to [their] request for additional discovery.") As succinctly stated by defendant, the Crescent Beach parties do not need the additional discovery they seek in order to get "a 'clear picture' of the work performed; [they] want[] a *different* picture of [the] work performed." (Defendant's Memorandum of Law in Opposition to Cross Motion and in further Support of Motion for Summary Judgment ["Def. Reply"] at 19).

sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016); *accord L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 117 (2d Cir. 2020); *see also In re Dana Corp.*, 574 F.3d 129, 148-49 (2d Cir. 2009) ("A court plainly has discretion to reject a request for discovery if the evidence sought would be cumulative or if the request is based only on speculation as to what potentially could be discovered.") With the exception of the request for a complete deposition of Barnaba, the Crescent Beach parties describe the requested discovery "in such general terms that [they] failed to explain with any specificity how the facts sought are reasonably expected to create a genuine issue of material fact." *Alphonse Hotel*, 828 F.3d at 151; *see also Ortiz*, 782 F. App'x at 67 (finding that the plaintiff failed to meet the requirements of a Rule 56(d) affidavit where "[t]he affidavit merely describe[d] the materials sought, such as depositions, without explaining the facts these materials would establish."); *American Honda Fin. Corp. v. Simao*, 526 F. App'x 112, 114 (2d Cir. May 10, 2013) (summary order) (holding that "conclusory allegations that additional discovery was needed" are insufficient to warrant relief under Rule 56(d)).

Moreover, the Crescent Beach parties never previously sought such discovery in this action and, in fact, affirmatively asserted in their letter motion regarding Barnaba's deposition that they "do[] not anticipate, nor [do they] intend on, deposing any other parties in this matter." (*See* DE 15). *See, e.g. Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. May 15, 2012) (summary order) (affirming denial of Rule 56(d) motion where the plaintiff's affidavit "lacked any particularity as to how the facts sought would create an issue of

23

material fact and made no attempt to explain the efforts [he] made to obtain those facts during the time provided for discovery.") Furthermore, the Crescent Beach parties' failure to timely raise any discovery disputes, including with respect to the redacted records defendant produced in response to their discovery demands, warrants denial of their request for relief under Rule 56(d) of the Federal Rules of Civil Procedure. *See, e.g. Alzawahra v. Albany Med. Ctr.*, 546 F. App'x 53, 55 (2d Cir. Dec. 5, 2013) (summary order) (declining to rule on discovery disputes raised for the first time in opposition to summary judgment motion).

With respect to the further deposition of Barnaba, the Crescent Beach parties contend that they need such discovery "to inquire as to (1) why he never discussed with coverage counsel . . . whether Crescent can credibly assert a 'routine maintenance defense' to Flores' Labor Law claims; (2) why he never sought an inspection of the pergola itself; and (3) why an expert was never retained to provide an opinion on the work performed."[18] (CBP Mem. at 8). However, such material either is not germane to the Crescent Beach parties' defense to defendant's motion for summary judgment or would not change the outcome of defendant's summary judgment motion, and, thus, is insufficient to warrant relief under Rule 56(d) of the Federal Rules of Civil Procedure. *See, e.g. Ortiz*, 782 F. App'x at 67 (finding that the plaintiff was not entitled to discovery, *inter alia*, because he failed to show how the fact was material); *Hudson River Sloop*,

---

[18] The Crescent Beach parties also generally contend that "the further deposition of Barnaba is necessary to ascertain whether Defendant Indian timely disclaimed coverage, improperly directed the course of Crescent's defense and/or was actually misled by any of the alleged representations made to him by or on behalf of Crescent." (CBP Mem. at 8). Such conclusory allegations are insufficient to warrant relief under Rule 56(d) of the Federal Rules of Civil Procedure, particularly since, *inter alia*, the Crescent Beach parties have not asserted any claims relating to defendant's claims handling or defense in the underlying action. Rather, the sole issue before this Court is with respect to defendant's disclaimer of coverage based upon the Construction Exclusion. Moreover, to the extent that the Crescent Beach parties contend that defendant "improperly withheld certain documentation relevant to this litigation," specifically the reports generated by PMT for the period from October 2, 2017 to August 2, 2018, (*see* CBP Mem. at 8), such reports were subsequently obtained by the Crescent Beach parties and submitted in their reply papers in further support of their cross motion, and they are insufficient to raise a genuine issue of material fact.

891 F.2d at 422 ("[E]ven if plaintiffs had obtained what they stated would be uncovered, the information would have been insufficient to defeat summary judgment.") Accordingly, the Crescent Beach parties' request to defer consideration of the parties' respective cross motions for summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure is denied.

      B.     Timeliness of Disclaimer

In their memorandum of law in opposition to defendant's motion and in support of their cross motion for summary judgment, the Crescent Beach parties contend, for the first time, that defendant is estopped from disclaiming coverage in the Crescent Action because it did not "issue a disclaimer within a reasonable timeframe" after it learned of the facts for its disclaimer.

To the extent the Crescent Beach parties seek leave to amend their pleadings to assert a claim or defense of estoppel based upon the timeliness of the September 7, 2018 Disclaimer, (*see* Crescent Beach Parties' Memorandum of Law in Further Support of Cross Motion for Summary Judgment ["CBP Reply"] at 12), any such amendment would be futile. Under New York law, which the parties agree applies to this dispute,

> "If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant."

N.Y. Ins. Law § 3420(d)(2). Thus, "an insurer must notify an insured as 'soon as is reasonably possible' of its intention to disclaim coverage for bodily injury under a policy." *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 369 F.3d 102, 106-07 (2d Cir. 2004).

The Court of Appeals of the State of New York has "clarified the application of the statute by holding that

> once the insurer has sufficient knowledge of facts entitling it to disclaim, or knows that it will disclaim coverage, it must notify the policyholder in writing as soon as is reasonably possible. [] Timeliness of an insurer's disclaimer is measured from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage."

*Country-Wide Ins. Co. v Preferred Trucking Servs. Corp.*, 22 N.Y.3d 571, 575-76, 983 N.Y.S.2d 460, 6 N.E.3d 578 (N.Y. 2014); *see also Continental Cas. Co. v. Stradford*, 11 N.Y.3d 443, 449, 871 N.Y.S.2d 607, 900 N.E.2d 144 (N.Y. 2008) ("[T]he time from which an insurer's obligation to disclaim runs . . . begins when an insurer first becomes aware of the ground for its disclaimer."); *Webster ex rel. Webster v. Mount Vernon Fire Ins. Co.*, 368 F.3d 209, 215-16 (2d Cir. 2004) ("[T]he reasonableness of the time period that an insurer takes to issue its disclaimer is judged with reference to the date on which the insurer has sufficient facts to allow a good faith disclaimer of coverage.") "If the insurance carrier fails to disclaim coverage in a timely manner, it is precluded from later successfully disclaiming coverage." *NGM Ins. Co. v. Blakely Pumping, Inc.*, 593 F.3d 150, 153 (2d Cir. 2010); *see also Matter of New York Cent. Mut. Fire Ins. Co. v. Aguirre*, 7 N.Y.3d 772, 774, 820 N.Y.S.2d 848, 854 N.E.2d 146 (N.Y. 2006) ("An insurer's failure to provide notice as soon as is reasonably possible precludes effective disclaimer."); *City Club*, 369 F.3d at 107 ("A failure by the insurer to give such notice as soon as is reasonably possible after it first learns of the accident or of grounds for disclaimer of liability or denial of coverage, precludes effective disclaimer or denial.") Thus, the dispositive question is when defendant obtained sufficient facts about the nature of the work being performed by Flores at the

26

Premises to determine that Flores's claims in the Crescent Action fall within the scope of the Construction Exclusion.

"[A]n insurer who delays in giving written notice of disclaimer bears the burden of justifying the delay." *Country-Wide*, 22 N.Y.3d at 576, 983 N.Y.S.2d 460; *see also First Fin. Ins. Co. v. Jetco Contracting Corp.*, 1 N.Y.3d 64, 70, 769 N.Y.S.2d 459, 801 N.E.2d 835 (N.Y. 2003) ("[I]t is the responsibility of the insurer to explain its delay.") "The question whether an insurer disclaimed as soon as reasonably possible is necessarily case-specific." *Country-Wide*, 22 N.Y.3d at 576, 983 N.Y.S.2d 460; *see also Stradford*, 11 N.Y.3d at 449, 871 N.Y.S.2d 607 ("[T]imeliness almost always presents a factual question, requiring an assessment of all relevant circumstances surrounding a particular disclaimer."); *Jetco*, 1 N.Y.3d at 70, 769 N.Y.S.2d 459 ("[M]ost often the question whether a notice of disclaimer has been sent 'as soon as is reasonably possible' will be a question of fact, dependent on all of the circumstances of a case that make it reasonable, or unreasonable, for an insurer to investigate coverage.") Where "the justification for disclaimer is readily ascertainable from the face of the complaint in the underlying action, . . . or all relevant facts supporting [] a disclaimer are immediately apparent [] upon [] receipt of notice of the accident, . . . a disclaimer must be made rapidly." *Country-Wide*, 22 N.Y.3d at 576, 983 N.Y.S.2d 460.

However, "the delay occasioned by a reasonably prompt, thorough, and diligent investigation of the claim does not render the insurer's disclaimer untimely, because an investigation is often necessary to determine whether there is any basis for disclaiming coverage." *Webster*, 368 F.3d at 216-17; *see also City Club*, 369 F.3d at 107 ("Where the grounds for disclaimer are not readily apparent, an insurer must be given reasonable time to

27

adequately investigate a claim in order to determine whether it wishes to disclaim coverage, . . . but the insurer also has an obligation to engage in a reasonably prompt, thorough, and diligent investigation of the claim."); *Jetco*, 1 N.Y.3d at 69, 769 N.Y.S.2d 459 ("[I]nvestigation into issues affecting an insurer's decision whether to disclaim coverage obviously may excuse delay in notifying the policyholder of a disclaimer.") "There is no exact number of days that can be said to be reasonable or unreasonable; the determination of whether a delay is reasonable is fact-specific and ultimately focuses on whether the investigation was used as a dilatory tactic or was made promptly and in good faith. *Netherlands Ins. Co. v. United Specialty Ins. Co.*, 276 F. Supp. 3d 94, 107 (S.D.N.Y. 2017); *see also United Fin. Cas. Co. v. Country-Wide Ins. Co.*, 779 F. App'x 761, 764 (2d Cir. July 1, 2019) (summary order) ("Insurers are entitled to conduct thorough investigations before disclaiming coverage, as long as they are not used as a dilatory tactic.")

It is undisputed that defendant first received notice of the Crescent Action on February 16, 2017, and the record establishes that defendant initially received inaccurate information about the nature of Flores's claim, *i.e.*, it was first reported as akin to a "routine maintenance work" or a "small maintenance job." After Barnaba received inconsistent information about the nature of the work being performed at the Premises, raising the possibility that Flores's claims in the Crescent Action might fall within the scope of the Construction Exclusion, and less than one (1) month after receiving first notice of the claim, defendant issued the ROR. Following an approximately seventeen (17)-month period during which the parties to the Crescent Action exchanged information and conducted discovery, and approximately one (1) month after the last depositions were conducted in the Crescent Action, defendant issued the September 7, 2018

Disclaimer.[19] Under the circumstances of this case, defendant disclaimed coverage within a reasonable time after it became readily apparent from the evidence it received about the nature of the work being performed by Flores at the Premises that Flores's claims in the Crescent Action fall within the scope of the Construction Exclusion, *i.e.*, approximately one (1) month after depositions and discovery in the Crescent Action provided the factual basis for its disclaimer. *See, e.g. Mount Vernon Fire Ins. Co. v. Harris*, 193 F. Supp. 2d 674, 678 (E.D.N.Y. 2002) ("It is perfectly reasonable that the insurer verify the surrounding facts so that, if it chooses to disclaim, it does so on the basis of concrete evidence."); *QBE Ins. Corp. v. D. Gangi Contracting Corp.*, 66 A.D.3d 593, 593-94, 888 N.Y.S.2d 474 (N.Y. App. Div. 2009) (finding that the insurer's disclaimer was given as soon as was reasonably possible where it was issued within two (2) days of the insurer's discovery of the ground therefor and much of the complained of delay was attributable, *inter alia*, to the originally inaccurate information it was given); *Liberty Ins. Underwriters Inc. v. Great Am. Ins. Co.*, No. 09 Civ. 4912, 2010 WL 3629470, at * 9 (S.D.N.Y. Sept. 17, 2010) ("New York courts have found that a disclaimer of coverage issued within a month after the insurer obtains sufficient facts to form the basis of the disclaimer is, as a matter of law, reasonable."); *cf. N.Y. State Ins. Fund v. Mount Vernon Fire Ins. Co.*, No. 03 Civ. 6652, 2005 WL 82036, at * 5 (S.D.N.Y. Jan. 13, 2005), *aff'd*, 371 F. App'x 207 (2d Cir. Apr. 6, 2010) (holding that the insurer's notice of disclaimer was untimely where, *inter alia*, "it delayed nearly a year after depositions which provided the factual basis for its disclaimer.")

---

[19] The Crescent Beach parties do not raise an issue regarding the timeliness of the disclaimer in the Scoroposki Action, nor could they since the September 20, 2018 Disclaimer was issued less than one (1) week after defendant received first notice of that action.

The cases cited by the Crescent Beach parties in support of their contention that "[i]t is unreasonable for an insurer to delay in disclaiming coverage where the basis for the disclaimer was readily apparent from other information then available to the insurer," (CBP Mem. at 23), are distinguishable. For example, the case *Pav-Lak Indus., Inc. v. Arch Ins. Co.*, 56 A.D.3d 287, 866 N.Y.S.2d 671 (N.Y. App. Div. 2008), involved an additional insured coverage endorsement unambiguously extending coverage to injuries sustained by the sub-subcontractor's employee arising out of the operations or work of the subcontractor. The Supreme Court of the State of New York, Appellate Division, First Judicial Department (the "First Department"), held that the defendant's forty-five (45)-day delay in disclaiming coverage was unreasonable as a matter of law since "[t]here was no need for an investigation, because the basis for the disclaimer was readily apparent from [the excess insurer's] tender letter." *Id.*, 56 A.D.3d at 287-88, 866 N.Y.S.2d 671.

Similarly, in *Gotham Constr. Co., LLC v. United Nat'l Ins. Co.*, 35 A.D.3d 289, 829 N.Y.S.2d 5 (N.Y. App. Div. 2006), the First Department held that the insurer's fifty (50)-day delay in issuing its disclaimer based upon the residential projects exclusion in the policy was unreasonable as a matter of law "because the basis for the disclaimer was apparent from the documents forwarded to it with the tender, and . . . [it] had no need to conduct an investigation before determining whether to disclaim." *Id.* at 289-90, 829 N.Y.S.2d 5.

Likewise, in *West 16th St. Tenants Corp. v. Public Serv. Mut. Ins. Co.*, 290 A.D.2d 278, 736 N.Y.S.2d 34 (N.Y. App. Div. 2002), the First Department found that the insurer's delay in disclaiming coverage on the basis of the plaintiff's failure to comply with policy conditions, *i.e.*, the plaintiff's delay in notifying it of the occurrence giving rise to the claim, was unreasonable as

a matter of law because "the sole ground on which [the insurer] disclaimed coverage[] was obvious from the face of the notice of claim and the accompanying complaint, and [the insurer] had no need to conduct an investigation before determining whether to disclaim." *Id.* at 279, 736 N.Y.S.2d 34.

Additionally, in *City of New York v. Northern Ins. Co. of N.Y.*, 284 A.D.2d 291, 725 N.Y.S.2d 374 (N.Y. App. Div. 2001), the Supreme Court of the State of New York, Appellate Division, Second Judicial Department (the "Second Department"), held that the insurer's two (2)-month delay in disclaiming coverage based upon the additional insured's delay in notifying it of its claim under the policy at issue was unreasonable as matter of law because "the ground for disclaimer was obvious on the face of the [additional insured's] notice of claim," and the insurer's "attempt to justify its delay in disclaiming coverage on the ground that it had to investigate whether the City was an additional insured . . . [was] an insufficient excuse as a matter of law, as such an investigation was unrelated to the reason for the disclaimer and could have been asserted at any time." *Id.* at 292, 725 N.Y.S.2d 374.

Unlike the aforementioned cases cited by the Crescent Beach parties, the basis for defendant's disclaimer was not "readily apparent before the onset of the delay," *Jetco*, 1 N.Y.3d at 69, 769 N.Y.S.2d 459; nor was the defendant's investigation unrelated to the initial reason for the disclaimer. Rather, Indian Harbor has sufficiently demonstrated that its delay in issuing the September 7, 2018 Disclaimer in the Crescent Action "was reasonably related to the completion of a necessary, thorough, and diligent investigation . . . into issues that would affect the decision on whether to disclaim," *Discover Prop. & Cas. Ins. Co. v. Pathmark Stores, Inc.*, No. 09-cv-1529, 2010 WL 4365561, at *5 (E.D.N.Y. Oct. 27, 2010), *i.e.*, the nature of the work being

performed by Flores at the Premises and whether it fell within the scope of the Construction

Exclusion; and that its disclaimer was issued as soon as was reasonably possible after the

evidence revealed the applicability of the Construction Exclusion. *See, e.g. Netherlands Ins.*, 276

F. Supp. 3d at 106 (holding that an insurer can satisfy its burden of justifying a delay in giving

notice of disclaimer "by proving, for example, that the delay was reasonably related to the

completion of a necessary, thorough, and diligent investigation by the insurer into issues that

would affect the decision on whether to disclaim."); *Quincy Mut. Fire Ins. Co. v. Uribe*, 45

A.D.3d 661, 662, 845 N.Y.S.2d 434 (N.Y. App. Div. 2007) ("When the explanation offered for

the delay is an assertion that there was a need to investigate issues that will affect the decision on

whether to disclaim, the burden is on the insurance company to establish that the delay was

reasonably related to the completion of a necessary, thorough, and diligent investigation.")

Accordingly, the branch of the Crescent Beach parties' cross motion seeking summary judgment

on their claims against defendant on the basis that defendant is "estopped from disclaiming

coverage on the grounds asserted in its disclaimer," (CBP Mem. at 25), is denied.


C.      Construction Exclusion

It is well-settled that "interpretation of an insurance agreement is a question of law,"

*High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 93 (2d Cir. 2018); *accord U.S. Fid. &*

*Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 149 (2d Cir. 2016), as is the question of whether

an insurance provision is clear or ambiguous. *VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699

F.3d 727, 729 (2d Cir. 2012); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d

190, 201 (2d Cir. 2010). Under New York law, "[t]he court must interpret the contract to give

effect to the intent of the parties as expressed in the clear language of the contract," *Intelligent Digital Sys., LLC v. Beazley Ins. Co.*, 716 F. App'x 1, 3 (2d Cir. Sept. 19, 2017) (summary order); *accord Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019), and insurance policies are interpreted according to principles of contract law, "giving policy language its plain and ordinary meaning." *Zurich Am. Ins. Co. v. Liberty Mut. Ins. Co.*, 710 F. App'x 3, 6 (2d Cir. Oct. 5, 2017) (summary order); *see also Olin Corp. v. American Home Assur. Co.*, 704 F.3d 89, 98-99 (2d Cir. 2012) ("Under New York law, insurance policies are interpreted according to general rules of contract interpretation. . . . [T]he words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.")

Generally, the burden of proving that a coverage exclusion applies rests with the insurer. *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018); *accord Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012). In New York, "[t]he law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds[,]" *Beazley*, 880 F.3d at 68, and "[p]olicy exclusions are enforced only when they have a definite and precise meaning, unattended by danger of misconception [] and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 68-69; *see also Parks Real Estate Purchasing Grp. v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon.") "[E]xclusions or exceptions from policy

coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Beazley*, 880 F.3d at 69; *see also Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 142 (2d Cir. 2014) ("Exclusions are subject to strict construction and must be read narrowly.") "[B]efore an insurance company is permitted to avoid policy coverage it must establish that the exclusions apply in the particular case and are subject to no other reasonable interpretation." *Zurich*, 710 F. App'x at 7; *see also Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.,* 650 F. App'x 70, 71 (2d Cir. May 25, 2016) (summary order) ("When an insurance contract contains an exclusion provision, the insurer generally bears the burden of proving that the claim falls within the scope of an exclusion by establishing that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.")

However, "although the insurer has the burden of proving the applicability of an exclusion . . . it is the insured's burden to establish the existence of coverage." *Platek v Town of Hamburg*, 24 N.Y.3d 688, 694, 3 N.Y.S.3d 312, 26 N.E.3d 1167 (N.Y. 2015); *see also Ment Bros.*, 702 F.3d at 121-22 ("[A]fter an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies.") Thus, where, as here, "the existence of coverage depends entirely on the applicability of an exception to the exclusion, the insured has the duty of demonstrating that it has been satisfied." *Platek*, 24 N.Y. 3d at 694, 3 N.Y.S.3d 312; *accord Fruchthandler v. Tri-State Consumer Ins. Co.*, 171 A.D.3d 706, 707, 96 N.Y.S.3d 649 (N.Y. App. Div. 2019).

1.      Ambiguity of Construction Exclusion

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018); *see also Certified Multi-Media Sols., Ltd. v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC*, 674 F. App'x 45, 47 (2d Cir. Jan. 3, 2017) (summary order) ("The initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."); *In re Lehman Bros. Holdings Inc.*, 761 F.3d 303, 309 (2d Cir. 2014) ("After giving all the terms of a contract their plain meaning . . . we determine whether language in a contract is ambiguous.") "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011); *see also Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 795 (2d Cir. 2017) ("The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous.") "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent . . . or where its terms are subject to more than one reasonable interpretation." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,, Pa.*, 25 N.Y.3d 675, 680, 16 N.Y.S.3d 21, 37 N.E.3d 78 (N.Y. 2015); *see also Lockheed*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."); *Duane Reade*, 600 F.3d at 201 ("We will find language in an insurance contract ambiguous if reasonable minds could differ as to its meaning. . . . In other words,

ambiguity is present where the contractual language at issue is reasonably susceptible to more than one reading.")

On the other hand, "[a]mbiguity is absent where the contract's language provides a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin*, 704 F.3d at 99; *accord Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019). "Courts are not required to find contract language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning." *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016); *see also Olin*, 704 F.3d at 99 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."); *Universal*, 25 N.Y.3d at 680, 16 N.Y.S.3d 21 ("[P]arties cannot create ambiguity from whole cloth where none exists, because provisions are not ambiguous merely because the parties interpret them differently.") "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Universal*, 25 N.Y.3d at 680, 16 N.Y.S.3d 21; *accord Medidata Sols., Inc. v. Fed. Ins. Co.*, 268 F. Supp. 3d 471, 476 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 117 (2d Cir. July 6, 2018). Moreover, courts "do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013); *see also Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082, 104 N.Y.S.3d 596, 128 N.E.3d 674 (N.Y. 2019) ("[W]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four

36

corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.")

Indian Harbor based its disclaimer of coverage on the Policy's Construction Exclusion, which excludes coverage for any loss "either arising out of, or related to, any construction, renovation, rehabilitation, demolition, erection, excavation or remedition [*sic*] of any building and includes planning, site preparation, surveying or other other [*sic*] construction or development of real property." However, the Crescent Beach parties contend, *inter alia*, that the alleged incident falls within the exception to the Construction Exclusion for "routine maintenance activities." (*See, e.g.* CBP Mem. at 12 ["[T]he crux of this matter rests on the application of the Policy's . . . [Construction Exclusion], which expressly provides coverage to Crescent for claims made against it arising from bodily injuries sustained during the course of 'routine maintenance activities.' . . . The sole issue before this Court is whether Flores was engaged in 'routine maintenance activities' when this incident allegedly occurred."]).

There is no dispute that the Policy itself does not define any of the relevant terms in the Construction Exclusion, *e.g.*, "construction," "demolition," "erection" or "routine maintenance activities." The Crescent Beach parties contend that since the Policy does not expressly define the phrase "routine maintenance activities," the Construction Exclusion is ambiguous and "must be construed in Crescent's favor." (CBP Mem. at 12). However, "the fact that the language of the contract itself does not specify the meaning of a disputed term does not entail that an ambiguity … exists." *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001). "In the absence of guidance from the policy language, courts ask whether a body of law or an established custom or usage provides a definition[,]" *Beazley*, 880 F.3d at 69, "[f]or it is quite

37

possible that even where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters." *Id.* "The clear and explicit meaning of insurance policy provisions, interpreted in their ordinary and popular sense, controls judicial interpretation unless used by the parties in a technical sense or a special meaning is given to them by usage." *Lepore v. Hartford Fire Ins. Co.*, 800 F. App'x 29, 31 (2d Cir. Feb. 7, 2020) (summary order); *see also Hugo Boss*, 252 F.3d at 617-18 ("When interpreting a state law contract, . . . an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning.") By looking to an established body of law or industry custom and usage for guidance, "a possible ambiguity may ultimately be proven to be illusory." *Hugo Boss*, 252 F.3d at 618.

"[C]ontract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin*, 704 F.3d at 99; *accord Lepore*, 800 F. App'x at 31. "[T]he circumstances particular to each case must be considered in construing the meaning of the term," *General Assur. Co. v Schmitt*, 265 A.D.2d 299, 300, 696 N.Y.S.2d 72 (N.Y. App. Div. 1999); *see, e.g. VAM*, 699 F.3d at 734, and the court "cannot disregard the plain meaning of the policy's language [] in order to find an ambiguity where none exists." *Federal Ins. Co. v. American Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

Although the Policy does not define the disputed terms, the terms have an established legal meaning under state law sufficient to resolve any potential ambiguity in the Construction

Exclusion. Indeed, the parties seemingly agree that this Court may rely upon state law in interpreting the Construction Exclusion. (*See, e.g.*, CBP Mem. at 13 [relying upon the definitions of the relevant terms, including "routine maintenance," under New York Labor Law §§ 240 and 241, and stating, "Clearly, there is a direct relationship between the [Construction Exclusion] and these Labor Law sections. . . ."]). In fact, the Crescent Beach parties contend that "this Court *must* adopt the interpretation of 'routine maintenance activities' as defined under the Labor Law. . . ." (CBP Mem. at 13 [emphasis added]; *see also* CBP Reply at 4 [referring to the definition of "routine maintenance" under the Labor Law as "controlling"]).

The New York Industrial Code, to which New York courts look for purposes of determining liability under the New York Labor Law § 241(6), *see generally Saint v. Syracuse Supply Co.*, 25 N.Y.3d 117, 129, 8 N.Y.S.3d 229, 30 N.E.3d 872 (N.Y. 2015); *Joblon v. Solow*, 91 N.Y.2d 457, 466, 672 N.Y.S.2d 286, 695 N.E.2d 237 (N.Y. 1998), defines "construction work" as "[a]ll work of the types performed in the construction, erection, alteration, repair, maintenance, painting or moving of buildings or other structures, whether or not such work is performed in proximate relation to a specific building or other structure and includes, by way of illustration but not by way of limitation, the work of hoisting . . . and the structural installation of wood . . . and other building materials in any form or for any purpose." N.Y. Comp. Codes R. & Regs., tit. 12, § 23-1.4(b)(13). In addition, the Industrial Code defines "demolition work" as "[t]he work incidental to or associated with the total *or partial dismantling* or razing of a building or other structure including the removing or dismantling of machinery or other equipment." *Id.*, § 23-1.4(b)(16) (emphasis added); *see also Quizhpi v. S. Queens Boys & Girls*

*Club, Inc.*, 166 A.D.3d 683, 685, 87 N.Y.S.2d 187 (N.Y. App. Div. 2018); *Kharie v. S. Shore Record Mgmt., Inc.*, 118 A.D.3d 955, 956, 988 N.Y.S.2d 654 (N.Y. App. Div. 2014).

Similarly, New York Labor Law § 240(1) "applies where an employee is engaged 'in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure.'" *Esposito v. New York City Indus. Dev. Agency*, 1 N.Y.3d 526, 528, 770 N.Y.S.2d 682, 802 N.E.2d 1080 (N.Y. 2003) (quoting N.Y. Labor Law § 240(1)). "[T]he term 'altering' in section 240(1) requires making a significant physical change to the configuration or composition of the building or structure[,] . . . [and] excludes 'routine maintenance' and 'decorative modifications.'" *Saint*, 25 N.Y.3d at 125, 8 N.Y.S.3d 229; *see also Joblon*, 91 N.Y.2d at 465, 672 N.Y.S.2d 286 (holding that "routine maintenance" and "decorative modifications," such as the removal and replacement of a burnt-out lightbulb on an illuminated sign or "the minimal cleaning of windows," fall outside the reach of Section 240(1)). "Whether a physical change is significant depends on its effect on the physical structure." *Saint*, 25 N.Y.3d at 125, 8 N.Y.S.3d 229.

Moreover, "[d]emolition has been held to include dismantling or disassembling a structure." *Agate v. City of New York*, No. 04-cv-5457, 2009 WL 3171799, at * 5 (E.D.N.Y. Oct. 2, 2009); *see, e.g. Sinzieri v. Expositions, Inc.*, 270 A.D.2d 332, 333, 704 N.Y.S.2d 293 (N.Y. App. Div. 2000). In addition, under New York law, ""[r]epairing is distinguished from the uncovered activity of routine maintenance, which involves replacing components that require replacement in the course of normal wear and tear." *Markou v Sano–Rubin Constr. Co.*, 182 A.D.3d 674, 675-76, 122 N.Y.S.3d 386 (N.Y. App. Div. 2020); *see also Esposito*, 1 N.Y.3d at 528, 770 N.Y.S.2d 682 ("Although repairing is among the enumerated activities [in Section

240(1)], we have distinguished this from 'routine maintenance.'"); *Wass v County of Nassau*, 173 A.D.3d 933, 934-35, 103 N.Y.S.3d 478 (N.Y. App. Div. 2019) ("In determining whether a particular activity constitutes 'repairing,' courts are careful to distinguish between repairs and routine maintenance, the latter falling outside the scope of section 240(1) of the Labor Law.") Activities constituting "routine maintenance" outside the coverage of the New York Labor Law generally consist of "simple tasks, involving minimal work," *Saint*, 25 N.Y.3d at 126, 8 N.Y.S.3d 229; *see also Joblon*, 91 N.Y.2d at 465, 672 N.Y.S.2d 286 (holding that "simple, routine activities" are outside the scope of Section 240(1)), such as household window washing or cleaning, *see, e.g. Soto v. J. Crew Inc.*, 21 N.Y.3d 562, 568, 976 N.Y.S.2d 421, 998 N.E.2d 1045 (N.Y. 2013); replacing a torn window screen, *see, e.g. Chizh v. Hillside Campus Meadows Assocs., LLC*, 3 N.Y.3d 664, 665, 784 N.Y.S.2d 2, 817 N.E.2d 819 (N.Y. 2004); replacing or hanging wallpaper, *see, e.g. Schroeder v. Kalenak Painting & Paperhanging, Inc.*, 7 N.Y.3d 797, 798, 821 N.Y.S.2d 804, 854 N.E.2d 1268 (N.Y. 2006); changing a lightbulb, *see, e.g. Smith v. Shell Oil Co.*, 85 N.Y.2d 1000, 630 N.Y.S.2d 962, 654 N.E.2d 1210 (N.Y. 1995); and repairing or replacing components of a fixture that require replacement in the course of normal wear and tear. *See, e.g.*, *Esposito*, 1 N.Y.3d at 528, 770 N.Y.S.2d 682 (removing a cover from an air conditioning unit to fix the motor and belts); *Melski v. Fitzpatrick & Weller, Inc.*, 107 A.D.3d 1447, 1448, 967 N.Y.S.2d 304 (N.Y. App. Div. 2013) (replacing components on a boiler); *Thompson v. 1701 Corp.*, 51 A.D.3d 904, 857 N.Y.S.2d 732 (N.Y. App. Div. 2008) (replacing or tightening a screw or pin in the arm of a nonmotorized "door closer"); *Azad v. 270 5th Realty Corp.*, 46 A.D.3d 728, 729-30, 848 N.Y.S.2d 688 (N.Y. App. Div. 2007), *lv. denied*, 10 N.Y.3d 706, 857 N.Y.S.2d 39, 886 N.E.2d 804 (N.Y. 2008) (attachment of metal sheets over holes in a

41

gutter pipe). The question whether a particular activity falls within the scope of New York Labor Law § 240(1) "must be determined on a case-by-case basis, depending on the context of the work." *Prats v. Port Auth. of N.Y. & N.J.*, 100 N.Y.2d 878, 883, 768 N.Y.S.2d 178, 800 N.E.2d 351 (N.Y. 2003); *accord Lawler v. Globalfoundries U.S., Inc.*, No. 1:12-cv-0327, 2014 WL 4900480, at * (N.D.N.Y. Sept. 30, 2014), *appeal dismissed*, No. 14-4108 (2d Cir. Dec. 16, 2014); *Bonilla-Reyes v. Ribellino*, 169 A.D.3d 858, 860, 94 N.Y.S.3d 181 (N.Y. App. Div. 2019).

Where, as here, "the pertinent case law is ultimately read as defining the term with sufficient clarity, then the parties' use of that term in an agreement will not be deemed to create an ambiguity." *Hugo Boss*, 252 F.3d at 618. Since the relevant terms, *e.g.*, "construction," "demolition" and "routine maintenance activities," are clearly defined under New York law, which the parties agree is applicable to the Policy, defendant has satisfied its burden of establishing that the Construction Exclusion is stated in clear and unmistakable language and is subject to no other reasonable interpretation. Therefore, the Construction Exclusion is unambiguous as a matter of law.

2.      Interpretation of the Construction Exclusion[20]

There being no ambiguity in the language of the Construction Exclusion, the Court's task is merely to apply such language, *i.e.*, the definition of the relevant terms, to the facts presented

---

[20] The Court declines to consider any argument raised for the first time in the Crescent Beach parties' reply brief, *e.g.*, whether the pergola at issue can be characterized as a "building" for purposes of the Construction Exclusion, (*see* CBP Reply at 6). *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *e.g. Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 305 n. 2 (2d Cir. Apr. 9, 2020) (declining to address argument raised for the first time in reply brief as waived). In any event, the Crescent Beach parties' contention improperly considers a particular term in isolation and fails to read the entire language of the Construction Exclusion as a whole.

in this case to determine whether the work in which Flores was engaged at the time of the accident involved "demolition," "erection" or "construction" within the meaning of the Construction Exclusion, or constituted "routine maintenance activities" within the meaning of the exception to the Construction Exclusion.

"If the contract is unambiguous, its meaning is [] a question of law for the court to decide," *Lepore*, 800 F. App'x at 31, and "the intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014). "[I]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." *American Home*, 639 F.3d at 567; *see also Olin*, 704 F.3d at 99 ("An unambiguous provision of the contract should be given its plain and ordinary meaning and the contract should be construed without reference to extrinsic evidence."); *VAM*, 699 F.3d at 729 ("Under New York insurance law, the plain language of an insurance policy, read in light of common speech and the reasonable expectations of a businessperson, . . . will govern if the language is unambiguous.") Since the Court concludes that the Construction Exclusion is unambiguous, there is no need to consider extrinsic evidence "to ascertain the parties' intent at the formation of the contract," *Olin*, 704 F.3d at 99; *see also MV Realty PBC, LLC v. Innovatus Capital Partners, LLC*, 794 F. App'x 103, 107 (2d Cir. Dec. 30, 2019) (summary order) ("[E]xtrinsic evidence may be considered only once the court has concluded that the contract is ambiguous"), or to resort to other rules of contract interpretation, such as "New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured." *Olin*, 704 F.3d at 99; *see also Hugo Boss* 252 F.3d at 616

("[T]he *contra proferentem* does not come into play unless this court first determines that the contract is, in fact, ambiguous.")

Marrone, Scoroposki and Denny, who is described by both Silver and Scoroposki as a handyman for the Premises, all testified that the work in which Flores was engaged at the Premises was too big for Denny and too much for him to handle, even though, according to Scoroposki, Denny did "light construction work" around the Premises. Scoroposki testified that he, therefore, hired Phil-Mar as a "general contractor" to "work on the pergola." According to Marrone, Phil-Mar was hired "to dismantle an existing pergola and replace it with a new pergola" at the Premises. According to Flores, he was told to "demolish a frame," which involved cutting and removing "large" beams of wood approximately six (6) feet in length utilizing a "lift machine" and/or "man lift," as well as a Sawzall and other tools supplied by his employer, Phil-Mar. In addition, Silver, the general manager of the Premises, testified at his deposition that the pergola was "being dismantled or taken down," and that Phil-Mar had been hired "to take down the pergola" because it had become rotted and needed to be taken down before the winter. Silver further testified that about half of the pergola "was taken down and then rebuilt."

Although Silver subsequently averred in the affidavit he submitted in support of the Crescent Beach parties' motion for summary judgment in the underlying action that Phil-Mar was retained "solely to remove the rotted and worn wood" on only a portion of the pergola, "a party's affidavit may not create an issue of fact by contradicting the affiant's previous deposition testimony." *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004); *see also Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact' doctrine

prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."). Since "the utility of summary judgment as a procedure for screening out sham issues of fact" would be "greatly diminish[ed]" "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, . . . factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial." *Moll*, 760 F.3d at 205. Accordingly, to the extent that Silver's affidavit conflicts with his prior deposition testimony, it is insufficient to raise a genuine issue of material fact.

However, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998); *see also Brown v. Reinauer Transp. Companies, L.P.*, 788 F. App'x 47, 49 (2d Cir. Oct. 4, 2019) (summary order) ( "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial. . . . There are two exceptions to this rule: when an issue was not fully explored in the deposition, or the deponents' responses were ambiguous."); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) ("[T]he principle does not apply if the deposition and the later sworn statement are not actually

contradictory . . . [or] where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition. . . . An issue of fact . . . may be revealed by a party's subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony.")

To the extent that Silver's deposition testimony merely "left an ambiguity that the later declaration clarified," *Maxwell*, 380 F.3d at 109, his affidavit, even when considered in conjunction with the affidavit and report of the Crescent Beach parties' purported expert, Aiello, nonetheless fails to raise a genuine dispute of material fact. Even if Phil-Mar was hired only to remove rotted wood from a portion of the pergola and replace it with new wood of the same type, dimension and specifications, such work would not constitute "routine maintenance activities" within the meaning of the exception to the Construction Exclusion. According to Aiello, four (4) of the six (6) support posts and sixteen (16) of the twenty-four (24) support beams, or approximately two-thirds (2/3) of the support posts and beams of the pergola, as well as half of the beams which comprise the trellis on top of the structure, were removed and replaced. In other words, Phil Mar was retained to remove and replace approximately fifty-one (51) beams of wood, or more than half of the ninety-two (92) beams of woods which Aiello indicates comprises the structure, exclusive of "the footings below grade, the concrete piers, or any of the connecting hardware." (Aboulafia Decl., Ex. 6). Contrary to the Crescent Beach parties' contention, the work Phil-Mar was retained to perform on the Premises was not merely cosmetic or decorative, *i.e.*, it did not merely change the outward appearance of the pergola.[21]

---

[21] Aiello's statements regarding the nature of the work performed on the pergola, *e.g.*, that the work was merely "cosmetic" or "decorative" in nature, and "can only be characterized as routine maintenance," amount to legal conclusions concerning the ultimate issue in this case that exceed the permissible scope of opinion testimony under the Federal Rules of Evidence. *See, e.g. Sparta Commercial Servs., Inc. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir.

Rather, the work involved the partial dismantling of a structure and the installation of new wood which had a long-term structural effect that changed the pergola's structural integrity, and the way it reacts to the elements, in order to enhance its safety.

When considered against the background of the "the customs, practices, usages and terminology as generally understood in the particular trade or business," *Beazley*, 880 F.3d at 71, no ordinary person could reasonably construe the term "routine maintenance activities" to include the work in which Flores was engaged at the time of the alleged incident. The work was a significant undertaking that consisted of dismantling and replacing at least twenty-five percent (25%) of the rotted wood of a large wooden structure, including the majority of support posts and beams of the structure; required three (3) laborers, a mechanical lift and a variety of other tools, including a Sawzall; and took place over the course of multiple days.[22] Indeed, Aiello indicates in his report that "due to the weight and size of the wood, one person working alone would not be able to complete this task," (Aboulafia Decl., Ex. 6); and that it took more than one (1) day to complete the work. Far from being a simple and routine activity, the job was too big to be handled by the regular handyman who generally performed "light construction work" on the Premises, and was not the type of work that occurs on a frequent and recurring basis as part of

---

Feb. 22, 2017) (summary order) ("A district court properly rejects an expert's testimony . . . when the expert opines on witnesses' credibility or inappropriately draws legal conclusions."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible. . . . [A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) (holding that "legal opinions as to the meaning of the contract terms at issue," and "conclusions as to the legal significance of various facts," was "testimony concerning matters outside [the expert's] area of expertise.") Moreover, any assertions made by Aiello that do not depend upon expert knowledge, and which are thus appropriate to the testimony of fact witnesses, have also been disregarded by the Court. *See, e.g. Sparta*, 680 F. App'x at 20; *Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 714 (2d Cir. Dec. 5, 2014) (summary order).

[22] An invoice from Phil-Mar to Silver indicates that three (3) laborers were supplied on January 25, 2017, and five (5) laborers were supplied on January 31, 2017, "to take down entrance wood pergola." (Aboulafia Decl., Ex. 16).

the ordinary maintenance and care of the Premises. In fact, no such work had previously been

performed on the structure since it was erected in approximately 1992 and, according to Aiello,

the same type of work was not expected to be necessary on the pergola for approximately

another twenty-five (25) to thirty (30) years. Accordingly, the work in which Flores was engaged

at the time of the accident constituted more than just "routine maintenance activities;" it was

significant enough to constitute "demolition" and/or "construction" within the meaning of the

Construction Exclusion. *See, e.g. Panek v. County of Albany*, 99 N.Y.2d 452, 458, 758 N.Y.S.2d

267, 788 N.E.2d 616 (N.Y. 2003) (holding that the plaintiff was engaged in a significant physical

change to the building within the meaning of New York Labor Law § 240(1) where "[t]he

removal of the two 200–pound air handlers [from the cooling system] required two days of

preparatory labor, including the dismantling of electrical and plumbing components of the

cooling system, and involved the use of a mechanical lift to support the weight of the air

handlers."); *Phillips v. Powercrat Corp.*, 126 A.D.3d 590, 591, 6 N.Y.S.3d 50 (N.Y. App. Div.

2015) (finding that the dismantling and removal of heavy shelves that were bolted to the floors

and walls, which required the use of impact wrenches and Sawzalls, constituted "demolition" for

purposes of New York Labor Law §§ 240(1) and 241(6)); *Nowakowski v. Douglas Elliman*

*Realty, LLC*, 78 A.D.3d 1033, 1034, 913 N.Y.S.2d 241 (N.Y. App. Div. 2010)[23] ("[T]he activity

of removing a light fixture so that it can be repaired or replaced . . . falls within the purview of

Labor Law § 240(1)."); *Velasco v. Green-Wood Cemetery*, 8 A.D.3d 88, 89, 779 N.Y.S.2d 459

---

[23] In *Nowakowski*, the Second Department expressly distinguished the activity of removing a fixture so that it can be repaired or replaced, which does not constitute routine maintenance, from the activity of "replacing component parts which wear out in the normal course of 'wear and tear,' without also removing the fixture," which held "is more in the nature of routine maintenance." *Id.*, 78 A.D.3d at 1034, 913 N.Y.S.2d 241. Contrary to the Crescent Beach parties' contention, (*see* CBP Reply at 4), the removal and replacement of wooden support posts and beams of a structure is not akin to the mere removal of the component parts of a fixture.

(N.Y. App. Div. 2004) (finding that replacing loose and broken slate roof tiles, installing new flashing cement and copper flashing, and repairing a roof leak, *inter alia*, "was not . . . routine maintenance for which section 240(1) affords no protection.")

The cases upon which the Crescent Beach parties rely in support of their contention that "'Routine Maintenance' will be found where there is no evidence that the structure being worked on was broken or inoperable or where the work performed did not entail any significant physical change to the structure where it was located[,]" (CBP Mem. at 15), are inapposite. In *Royce v. DIG EH Hotels, LLC*, 139 A.D.3d 567, 33 N.Y.S.3d 172 (N.Y. App. Div. 2016), the plaintiff was injured when he "fell off a ladder while attempting to replace a gel that altered the color of one light on a temporary lighting stand secured to the floor by sandbags," and "[t]he work performed by plaintiff and his employer entailed moving audiovisual, staging and lighting equipment into a hotel ballroom, assembling, setting up, and positioning the equipment as necessary for its use in an event, and removing it after the event ended." *Id.* at 568, 33 N.Y.S.3d 172. Clearly, the activity in which the plaintiff was engaged in that case did not cause "a substantial, or indeed any, physical change to the building" within the meaning of New York Labor Law § 240(1). *Id.*

In *Goad v. Southern Elec. Int'l*, 263 A.D.2d 654, 693 N.Y.S.2d 301 (N.Y. App. Div. 1999), the plaintiff was injured during the course of installing a new main steam safety valve while attempting "to hang a chainfall to be used to set the new valve in place." *Id.* at 654, 693 N.Y.S.2d 301. The work was performed in connection with the "annual shutdown of the [steam cogeneration] facility for the maintenance and modification of certain *equipment*." *Id.* (emphasis added). The Supreme Court of the State of New York, Appellate Division, Third Judicial

49

Department, found that notwithstanding the size of the valve, which "necessitated the use of rigging to lift it into place,"[24] the replacement of the valve did not constitute a repair or alteration within the meaning of New York Labor Law § 240(1) since: (i) it "was one of many services" that the plaintiff's employer was retained to perform at the facility and "was undertaken as part of the 'routine maintenance' of the facility because, as part of its normal operation, it would develop leaks;" (ii) "no evidence was adduced that the valve was leaking or not operating properly at the time plaintiff attempted to replace it;" and (iii) "replacement of the valve did not entail any physical change to the structure where it was located." *Id.* at 655-56, 693 N.Y.S.2d 301.

Similarly, the case *LaFontaine v. Albany Mgmt.*, 257 A.D.2d 319, 691 N.Y.S.2d 640 (N.Y. App. Div. 1999), cited by the Crescent Beach parties, is distinguishable. In that case, the plaintiff was injured when he fell from a stepladder while removing and replacing wallpaper in a vacant apartment. *Id.* at 320, 691 N.Y.S.2d 640. The court held that removing and replacing wallpaper does not constitute "a significant physical change to the apartment's or to the apartment building's configuration or composition so as to fall within the statutory term altering." *Id.* at 321, 691

---

[24] The Crescent Beach parties cite the case *Robertson v. Little Rapids Corp.*, 277 A.D.2d 560, 715 N.Y.S.2d 482 (N.Y. App. Div. 2000), *abrogated on other grounds by Goad v. Southern Elec. Int'l, Inc.*, 304 A.D.2d 887, 758 N.Y.S.2d 184 (N.Y. App. Div. 2003), for the proposition that "the size of the component being replaced, the difficulty in reaching the component and the fact that the work necessitated the use of rigging to remove/lift the component are not factors in reaching this determination." (CBP Mem. at 16). However, *Robertson* does not, in fact, hold as such. Rather, the court held only that the size of the equipment being replaced, and the fact that it, "thus, entails a process that arguably is fraught with danger," is not, alone, sufficient to bring the case "within the narrow confines of the statute." *Id.* at 561, 715 N.Y.S.2d 482. In that case, the plaintiff was attempting to replace a component part on a piece of equipment, *i.e.*, "an 8,500-pound top press roll on a paper press machine." *Id.* at 560-61, 715 N.Y.S.2d 482. Indeed, contrary to the Crescent Beach parties' contentions that "the existence and use of a fork lift [*sic*] for this work is completely irrelevant," (CBP Mem. at 16); and that the size of the structure "has no bearing on whether the activities constitute 'routine maintenance,'" (*id.* at 21), New York courts have considered the size of the structure and the use of a forklift as relevant factors in analyzing whether the activity in which a plaintiff was engaged falls within the purview of the New York Labor Law. *See, e.g. Rodriguez v. Antillana & Metro Supermarket Corp.*, 179 A.D.3d 613, 614, 118 N.Y.S.3d 102 (N.Y. App. Div. 2020); *Perez v. Beach Concerts, Inc.*, 154 A.D.3d 602, 63 N.Y.S.3d 344 (N.Y. App. Div. 2017); *Phillips*, 126 A.D.3d at 591, 6 N.Y.S.3d 50.

N.Y.S.2d 640. Rather, "the paperhanging activity in which plaintiff was engaged is the type of cosmetic maintenance or decorative modification that is routinely provided to a vacant apartment between tenancies which does not effect a 'significant physical change' to the composition or configuration of the apartment and does not qualify as altering under th[e] statute." *Id.* at 322, 691 N.Y.S.2d 640. The court further held that the plaintiff's replacement "of deteriorating or unsightly wallpaper" did not constitute "repairing" within the meaning of Section 240(1) because "[i]t cannot be said that the existing wallpaper or walls behind it were broken, inoperable or not functioning properly." *Id.*

Unlike the wallpapering activity in *LaFontaine*, the activity in which Flores was engaged at the Premises, *i.e.*, the partial dismantling of the pergola and the installation of new wood thereon, did not merely change the outward appearance of the pergola; it affected the structural integrity and support of the pergola for the purpose of enhancing its safety and, thus, altered the configuration or composition of the structure by, *inter alia*, changing the way it reacted to the elements, such as snowfall in winter. *See generally Saint*, 25 N.Y.3d at 125, 8 N.Y.S.3d 229 ("Whether a physical change is significant depends on its effect on the physical structure."); *Cf. Munoz v. DJZ Realty, LLC*, 5 N.Y.3d 747, 748, 800 N.Y.S.2d 866, 834 N.E.2d 776 (N.Y. 2005) (holding that the activity in which the plaintiff was engaged, *i.e.*, applying a new advertisement to the face of a billboard, was "more akin to cosmetic maintenance or decorative modification than to 'altering' for purposes of Labor Law § 240(1)," since it merely "changed the outward appearance of the billboard, but did not change the billboard's structure"); *Belding v. Verizon N.Y., Inc.*, 14 N.Y.3d 751, 752-53, 898 N.Y.S.2d 539, 925 N.E.2d 577 (N.Y. 2010) (holding that the application of bomb blast film to the lobby windows qualified as a significant alteration for

purposes of Labor Law § 240(1) because it significantly altered the configuration or composition of the structure by changing the way the lobby windows reacted to, *inter alia*, the elements, which distinguished the work from the activity of merely affixing an advertisement on a billboard, "a more frequent change that has less structural effect."); *Mananghaya v. Bronx-Lebanon Hosp. Ctr.*, 165 A.D.3d 117, 124, 83 N.Y.S.3d 444 (N.Y. App. Div. 2018), *lv. dismissed*, 33 N.Y.3d 969, 100 N.Y.S.3d 213, 123 N.E.3d 872 (N.Y. 2019) (recognizing that work that affects a structure's "structural integrity" would qualify as an alteration for Labor Law purposes). Accordingly, defendant has satisfied its burden of demonstrating that the Construction Exclusion applies to Flores's work at the Premises; and the Crescent Beach parties have not satisfied their burden of either raising a genuine issue of material fact regarding the applicability of the Construction Exclusion, or of demonstrating that the exception to the Construction Exclusion for "routine maintenance activities" applies. Therefore, the branches of defendant's motion seeking summary judgment on its counterclaims for judgment declaring that it is not obligated to defend or indemnify the Crescent Beach parties in the underlying action are granted; defendant is granted judgment as a matter of law declaring that Flores's alleged injuries arise out of, or relate to, work excluded by the Construction Exclusion in the Policy, and that defendant is not legally obligated to defend or indemnify the Crescent Beach parties in the underlying action; and the branches of the Crescent Beach parties' cross motion seeking summary judgment on their claims declaring that defendant is so obligated are denied.

D.    Duty to Defend

The Crescent Beach parties contend that "at the very least Crescent is entitled to a continued defense in the underlying action until such time as the **underlying court** determines that Flores was not engaged in 'routine maintenance activities,'" (CBP Mem. at 22) (emphasis in original), but they cite no authority in support of that assertion.

"New York law distinguishes between the duty to indemnify and the duty to defend, applying very different presumptions to each." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 76-77 (2d Cir. 2013); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 117 (2d Cir. 2005) ("[T]he duty to defend is distinctly different from the duty to indemnify.") "The duty to defend is broader than the duty to indemnify and an even stronger presumption in favor of coverage applies." *CGS*, 720 F.3d at 77; *see also High Point*, 911 F.3d at 94-95 ("[T]he duty of an insurer to defend its insured is 'exceedingly broad' and far more expansive than the duty to indemnify its insured.") "Even where the insurer ultimately has no duty to indemnify due to policy exclusions, it may still be obligated to defend the insured *until the applicability of the exclusions is determined*." *CGS*, 720 F.3d at 77 (emphasis added); *see also Hugo Boss*, 252 F.3d at 620 ("[A] separate, contractual duty to defend exists, and perdures until it is determined *with certainty* that the policy does not provide coverage." (emphasis in original)); *Nat'l Fire Ins. Co. of Hartford v. E. Mishan & Sons, Inc.*, 650 F. App'x 793, 797 (2d Cir. June 1, 2016) (summary order) ("[T]he duty to defend exists only until it is determined *with certainty* that the policy does not provide coverage." (emphasis in original)); *CGS*, 720 F.3d at 82 (accord). "[T]he insurer's duty to defend is [] not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy." *Stein v. N. Assur. Co. of Am.*, 617

F. App'x 28, 30 (2d Cir. July 2, 2015) (summary order); *see also Burt Rigid Box, Inc. v.
Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) ("An insurer's duty to defend . . .
ends if it establishes as a matter of law that there is no possible factual or legal basis on which it
might eventually be obligated to indemnify its insured under any policy provision."); *MIC Gen.
Ins. Co. v. Allen*, 697 F. App'x 717, 720 (2d Cir. June 14, 2017) (summary order) ("Although an
insurer's duty to defend an insured in a pending lawsuit is exceedingly broad, . . . the insurer has
no duty to defend if it can be concluded as a matter of law that there is no possible factual or
legal basis on which the insurer will be obligated to indemnify the insured.")

      "In cases where there is doubt as to the applicability of a policy to a claim, that
uncertainty can be resolved long before the insurer has had to expend significant funds defending
the insured in the underlying litigation." *Hugo Boss*, 252 F.3d at 620-21. Indeed, as recognized
by the Second Circuit in *Hugo Boss*, in cases in which "the duty to defend cannot be eliminated
simply by examining the face of the complaint, . . . the insurer's responsibility to defend can,
nonetheless, be determined before the underlying claim is resolved," *id.* at 621, *inter alia*,
through the use of discovery devices or by seeking a declaratory judgment with respect to the
relevant policy exclusion. *Id.* at 622; *see, e.g. CGS*, 720 F.3d at 82. "[S]uch suits are
commonplace," *Hugo Boss*, 252 F.3d at 622, and "the duty to defend lasts only until the factual
ambiguity is resolved in favor of the insured." *Hugo Boss*, 252 F.3d at 622; *see also Century 21,
Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83-84 (2d Cir. 2006) (holding that the insurer's duty
to defend does not necessarily continue through resolution of the underlying claim,
notwithstanding the fact that coverage cannot be eliminated by examining the face of the
pleadings, and that the insurer's obligation to defend "endures unless and until there is a point in

the [underlying] proceeding" at which the factual nature of the allegations is clarified with certainty to exclude coverage).

Since, as set forth above, Flores's claims against the Crescent Beach parties in the underlying action are unequivocally not within the scope of the Policy's coverage, defendant's duty to defend them in the underlying action has now ended.[25] Accordingly, the branch of the Crescent Beach parties' motion seeking summary judgment declaring that defendant must continue to defend them in the underlying action is denied.

E.      Reimbursement of Defense Costs

Defendant seeks summary judgment on its counterclaim for reimbursement from Crescent Beach for past defense costs it incurred in the Crescent Action in the total amount of fifty-three thousand six hundred eighty-six dollars and six cents. ($53,686.06). Defendant essentially contends that since the underlying claims are excluded from the Policy, it should be able to recoup its costs in representing Crescent Beach to this point in the underlying action, particularly because it defended Crescent Beach under a reservation of rights only because they initially misrepresented the nature of the work being performed at the Premises at the time of the underlying incident. Defendant points to no provision of the Policy explicitly granting it the right to seek recoupment of defense costs; instead it contends that Crescent Beach would be unjustly enriched by allowing them "to retain the value of defense costs they lied to obtain." (Def. Mem. at 15).

---

[25] Indeed, the Crescent Beach parties essentially concede as much insofar as they contend in their reply memorandum of law that "[s]hould this Court find that a question of fact does exist, then it must also find that Defendant Indian is obligated to afford Crescent [Beach] a defense in the underlying action unless and until that question is resolved in its favor." (CBP Reply at 5).

Unlike the duty to indemnify, which "is determined by the actual basis for the insured's liability to a third person, . . . [*i.e.*,] on whether the loss, as established by the facts, is covered by the policy[,]" *Fendi Adele*, 823 F.3d at 150, "[w]hen an insurer seeks to disclaim coverage on the basis of an exclusion [] the insurer will be required to provide a defense unless it can demonstrate that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Euchner-USA*, 754 F.3d at 142; *accord Lepore*, 800 F. App'x at 31. Thus, with respect to the duty to defend, "[w]hen an exclusion clause is relied upon to deny coverage, the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted *only* to exclude coverage." *Euchner-USA*, 754 F.3d at 142 (emphasis in original).

"Under some circumstances, the allegations contained in the complaint against the insured will by themselves eliminate all potential doubt and relieve the insurer of any duty to defend." *Hugo Boss*, 252 F.3d at 621. However, unless "the policy is so clear that there is no uncertainty in fact or law" regarding whether coverage exists, an insurer cannot avoid its duty to defend until it is finally determined by the court or jury: (i) that the injury or loss did not occur in a time, place, or way that is covered by the policy, (ii) that the cases governing the insurance policy will not be read to impose coverage in the particular situation at issue, and (iii) that the terms of the policy will be held clear and unambiguous so as to avoid the *contra proferentem* presumption. *Hugo Boss*, 252 F.3d at 620; *see also CGS*, 720 F.3d at 80 ("[I]nsurers may refuse to defend only cases in which the policy is so clear that there is no uncertainty in fact or law.") Thus, even if the insurer's duty to defend may have ceased, it is not relieved of paying for its

insured's defense "up to the point it would have been certain in that proceeding that no further defense was owed under the insurance contract." *Century 21*, 442 F.3d at 84.

Since the duty to defend could not be eliminated simply by examining the face of Flores's complaint in the Crescent Action, and, indeed, defendant itself claims that it could not ascertain the applicability of the Construction Exclusion until after depositions and discovery were complete in the Crescent Action, a duty to defend existed so long as there remained uncertainty as to whether coverage was required. *See, e.g. CGS*, 720 F.3d at 81; *Hugo Boss*, 252 F.3d at 621-22. In other words, since the duty to defend existed until it was legally determined that there is no possibility for coverage under the Policy, defendant is not entitled to any reimbursement for defense costs it previously expended in the underlying action. Where, as here, the Policy provides a duty to defend, but has no express contractual provision allowing for recoupment of defense costs, and the insurer provided a defense in compliance with its contractual duty to defend, recoupment of past defense costs is inappropriate. *See, e.g. General Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 463-64 (E.D.N.Y. 2015), *appeal withdrawn*, No. 15-605 (2d Cir. June 19, 2015); *Century Surety Co. v. Vas & Sons Corp.*, No. 17-cv 5392, 2018 WL 6164724, at * 6-8 (E.D.N.Y. Aug. 31, 2018), *report and recommendation adopted*, 2018 WL 4804656, at * 6 (E.D.N.Y. Sept. 30, 2018)[26].

Nor is defendant entitled to relief under a theory of unjust enrichment. "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, *in the absence of an actual agreement between the parties*." *Georgia*

---

[26] This Court is persuaded by the well-reasoned decision in *Century Surety* recognizing the distinction between an insurer's duty to defend, in connection with which recoupment is inappropriate, and "the narrower duty to advance defense costs," in connection with which recoupment has been authorized under New York law. *Id.*, 2018 WL 6164724, at *8.

*Malone & Co. v Rieder*, 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 973 N.E.2d 743 (N.Y. 2012)

(emphasis added); *see also IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132,

142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y. 2009) ("The theory of unjust enrichment lies as a

quasi-contract claim. . . . It is an obligation imposed by equity to prevent injustice, in the absence

of an actual agreement between the parties concerned.") Thus, under New York law, "[w]here

the parties executed a valid and enforceable written contract governing a particular subject

matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is

ordinarily precluded." *IDT*, 12 N.Y.3d at 142, 879 N.Y.S.2d 355; *see also Pappas v Tzolis*, 20

N.Y.3d 228, 234, 958 N.Y.S.2d 656, 982 N.E.2d 576 (N.Y. 2012) ("A party may not recover in

[] unjust enrichment where the parties have entered into a contract that governs the subject

matter.") Since the Policy is an extensive, detailed contract governing the particular subject

matter of coverage for claims against Crescent Beach, defendant cannot recover on a quasi-

contractual claim for unjust enrichment. *See, e.g. General Star*, 80 F. Supp. 3d at 460-61.

Moreover, under New York law, an unjust enrichment claims requires a showing: "that

(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and

good conscience to permit the other party to retain what is sought to be recovered." *Georgia

Malone*, 19 N.Y.3d at 516,  950 N.Y.S.2d 333; *accord E.J. Brooks Co. v. Cambridge Sec. Seals*,

31 N.Y.3d 441, 455, 80 N.Y.S.3d 162, 105 N.E.3d 301 (N.Y. 2018). As recognized by the Court

in *General Star*, the insurer "bears the risk of not providing for recoupment in the Policy itself,"

because to hold otherwise "would risk eroding the well-established doctrine under New York

law of imposing an 'exceedingly broad' duty to defend on insurers." *General Star*, 80 F. Supp.

3d at 462. Furthermore, awarding recoupment under the circumstances of this case "would

effectively make the duty to defend coextensive with the duty to indemnify, despite the fact that New York courts have repeatedly held that the duty to defend is broader." *Id.*

In addition, "concerns of equity and fairness weigh against reimbursement, because an insurer benefits unfairly if it can hedge on its defense obligations by reserving its right to reimbursement while potentially controlling the defense and avoiding a bad faith claim." *General Star*, 80 F. Supp. 3d at 463. Equity and fairness also weigh against reimbursement where, as here, the insurer delays in seeking recoupment until after it has incurred many months or years of defense costs. *See, e.g. Century Surety*,  2018 WL 6164724, at * 7. Accordingly, the branch of the Crescent Beach parties' cross motion seeking summary judgment dismissing defendant's counterclaim against Crescent Beach for reimbursement of past defense costs in the underlying action is granted; the Crescent Beach parties are granted judgment as a matter of law dismissing that counterclaim; and the branch of defendant's motion seeking summary judgment on such counterclaim is denied.


IV.     Conclusion

For the reasons set forth above, (i) the branch of the Crescent Beach parties' cross motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing defendant's counterclaim against Crescent Beach for reimbursement of past defense costs it incurred in the underlying action is granted, the Crescent Beach parties are granted summary judgment dismissing such counterclaim in its entirety with prejudice, and the Crescent Beach parties' cross motion is otherwise denied in its entirety; (ii) the branch of defendant's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

on its counterclaim against Crescent Beach for reimbursement of past defense costs it incurred in the underlying action is denied; and (iii) defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is otherwise granted and defendant is granted judgment as a matter of law: (A) declaring that Flores's alleged injuries arise out of, or relate to, work excluded by the Construction Exclusion in the Policy, and that defendant has no duty to defend or indemnify the Crescent Beach parties in the underlying action, and (B) dismissing the Crescent Beach parties' claims in this action in their entirety with prejudice. The Clerk of the Court shall enter judgment in accordance with this Order and close this case.

SO ORDERED.

_/s/ Sandra J. Feuerstein_
Sandra J. Feuerstein
United States District Judge

Dated: June 22, 2020
        Central Islip, New York